# EXHIBIT 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

ST. ANN'S SCHOOL,

                      Petitioner,

          - against -

MICHAEL FISHMAN, PRESIDENT, LOCAL 32BJ,
SERVICE EMPLOYEES INTERNATIONAL UNION,

                    Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No.: 108221/07

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF ITS PETITION TO VACATE AN ARBITRATION AWARD

EPSTEIN BECKER & GREEN, P.C.
250 PARK AVENUE
NEW YORK, N.Y. 10177-1211

(212) 351-4500

Attorneys for Petitioner

TABLE OF CONTENTS

Preliminary Statement.................................................................................1

FACTS .......................................................................................................3

The Parties and the Contract ......................................................................3

Employee Anthony Rodriguez, His Failure to
Report to Work, and His November 21, 2006 Termination ......................3

The Union Seeks Arbitration on Behalf of Anthony Rodriguez................4

The First Session of the Arbitration, at which the School
Appeared with Counsel, and Communications with OCA
Concerning the Scheduling of the Completion of the Arbitration ............5

The Arbitrator's Refusal to Grant the School an
Adjournment Even Though the School's Counsel Did Not
Receive Notice, Was Not Present And Was Unavailable ..........................8

The April 11, 2007 Hearing.......................................................................9

The Arbitration Award................................................................................9


ARGUMENT.............................................................................................10

THE ARBITRATOR VIOLATED THE SCHOOL'S
RIGHTS BY DEPRIVING IT OF ITS UNWAIVABLE
STATUTORY RIGHT TO HAVE COUNSEL PRESENT .......................10

   A.  Counsel Did Not Receive Notice of the Hearing ..........................11

   B.  The Arbitrator Engaged in Misconduct by
      Depriving the School of Its Right to Counsel ...............................12

   C.  The Arbitrator's Misconduct Prejudiced the School .....................14

CONCLUSION...........................................................................................15

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ST. ANN'S SCHOOL,

                    Petitioner,

              - against -

MICHAEL FISHMAN, PRESIDENT, LOCAL 32BJ,
SERVICE EMPLOYEES INTERNATIONAL UNION,

                  Respondents.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Index No.: _____

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF ITS PETITION TO VACATE AN ARBITRATION AWARD

### Preliminary Statement

Petitioner, Saint Ann's School ("Petitioner" or the "School"), by its attorneys, Epstein Becker & Green, P.C., respectfully submits this memorandum of law in support of its Petition, pursuant to CPLR 7506(d) and 7511(b)(1)(i), (ii) and (iv), to vacate an arbitration award on the grounds that (A) the arbitrator, Marilyn M. Levine, of the Office of the Contract Arbitrator ("OCA"), engaged in misconduct during the arbitration and in issuing an award, (B) the arbitrator was partial as evidenced by her conduct, and (C) OCA did not provide Petitioner's counsel with notice of the arbitration hearing after which an award was issued in Respondents' favor.

It is undisputed that Arbitrator Levine conducted the hearing in the absence of the School's legal counsel. This constituted misconduct, and the award in respondents' favor must be vacated. See CPLR 7506(d); Nastasi v. Artenberg, 130 A.D.2d 469, 470, 515 N.Y.S.2d 52, 52 (2d Dep't 1987). The award should be vacated for these reasons as well: First, knowing the

School was represented by counsel, OCA failed and refused to provide the School's counsel with notice of subsequent dates on which the arbitration was scheduled to resume, notwithstanding the fact that, upon information and belief, such notice was provided to Respondents' counsel. OCA unilaterally scheduled the continuation of the arbitration for April 11, 2007, but failed to provide counsel with any notice of that date. Counsel only learned of the hearing on April 9, 2007 from the School's witness, and was already scheduled to appear for another professional engagement on April 11, 2007.

Second, the School's witness, Anthony Smith, Director of Buildings and Grounds, appeared on April 11, 2007 to obtain an adjournment so as to ensure that a default would not be entered against the School, but Arbitrator Levine refused to grant an adjournment of the arbitration.

Third, Mr. Smith, the School's witness, was coerced into proceeding with the Arbitration without the assistance of counsel, making it clear at every turn that he was doing so "under duress" and that he strenuously objected to proceeding with the arbitration without the presence or assistance of the School's counsel. The Arbitrator's actions deprived the School of its unwaivable statutory right to counsel.

Fourth, in an effort to conceal her misconduct, Arbitrator Levine misleadingly stated in her written Award that Mr. Smith *allegedly* indicated that "although he would prefer to have his attorney present, he was prepared to present [the School's] case." (Award at p. 5, Exhibit A to the Affidavit of Anthony Smith, sworn to June 12, 2007 (hereinafter, "Smith Aff.").) More accurately, Mr. Smith asserted that he was participating in the Arbitration without the School's attorney present "under duress," as he believed he had no other choice. (Smith Aff. at ¶ 2.) Apparently realizing the predicament her actions caused in forcing the School to proceed

without counsel, Arbitrator Levine also incorrectly stated in the Award that "the parties indicated that they had presented their cases in full." (Award at p. 6.) Mr. Smith denies that he "indicated" any such thing; instead, he made it clear throughout the proceedings that he needed and wished to have the School's attorney present. (Smith Aff. at ¶¶ 16-21.)

The School respectfully urges that the Arbitrator violated CPRL 7506(d) and that the School was denied due process as a result of the Arbitrator's misconduct. The Arbitrator's egregious conduct requires vacation of the Award.

<strong>FACTS</strong>[1]

**The Parties and the Contract**

Petitioner is a private coeducational school in Brooklyn, New York. (Smith Aff. at ¶ 3.) Respondent Michael Fishman is President of the Service Employees International Union, Local 32BJ (the "Union"). (Id. at ¶ 4.)

The School and the Union are parties to a collective bargaining agreement entered into on October 12, 2006 (the "Agreement") which contains, *inter alia,* a procedure for the resolution of disputes arising between the School and any unionized employees of the School. (Smith Aff., Exhibit B.) The Agreement designates the OCA as arbitrator for the resolution of such disputes. (Agreement, Article V.)

**Employee Anthony Rodriguez, His Failure to
Report to Work, and His November 21, 2006 Termination**

Anthony Rodriguez, a member of the Union, was employed by the School for approximately three years. (Smith Aff. at ¶ 6.) While employed by the School, several employees complained that Mr. Rodriguez threatened them. (Id.) Mr. Rodriguez's threatening

---

[1] The facts are set forth in the Smith Aff. and in the Affirmation of James S. Frank, Esq., dated June 12, 2007 ("Frank Aff.").

behavior resulted in the termination of Mr. Rodriguez's employment on September 29, 2006. (Id.)

Mr. Rodriguez then filed a grievance with the Union.  In early October 2006, Anthony Smith met with Union Business Agent Gordon Olekanma to discuss the Union's grievance regarding Mr. Rodriguez's termination.  (Id. at ¶ 7.)  At the meeting, Mr. Olekanma represented to Mr. Smith that Mr. Rodriguez was willing to cease his inappropriate behavior, and to conform to all School policies if the School would give him one more chance.  (Id.)

Based on the Union's assurances, on November 9, 2006, the School agreed to reinstate Mr. Rodriguez's employment effective Monday, November 13, 2006.  Mr. Olekanma, on behalf of Mr. Rodriguez, confirmed that Mr. Rodriguez agreed to comply with the School's rules and regulations, that he would not engage in any insubordinate behavior or conduct detrimental or disruptive to the School environment, and that he would appear for work on November 13, 2006.  (Id. at ¶ 8.)

On November 13, 2006, Mr. Rodriguez did not appear for work.  (Id. at ¶ 9.)  Mr. Rodriguez did not appear for work on any day that week, and did not contact the School to explain his absence.  (Id.)  As a result of his failure to appear for work, the School terminated Mr. Rodriguez's employment on November 21, 2006.  On November 21, 2006, Mr. Smith sent, by Express Mail, letters to the Union and Mr. Rodriguez informing them of Mr. Rodriguez's termination. (Smith Aff., Exhibit C.)

**The Union Seeks Arbitration on Behalf of Anthony Rodriguez**

On Friday, December 1, 2006, Mr. Olekanma called Mr. Smith to say that Mr. Rodriguez had returned from a trip and wished to return to work.  (Smith Aff. at ¶ 10.)  Mr. Smith responded that because Mr. Rodriguez failed to show up for work on November 13, 2006,

failed to show up any other time that week, and failed to contact the School to explain his absence, he was terminated on November 21, 2006. (Id. at ¶¶ 10, 30.) Mr. Smith also advised Mr. Olekanma that Mr. Rodriguez's prior position had been filled when he failed to report to work. (Id. at ¶ 10.)

On December 12, 2006, the Union sent a letter to the OCA seeking arbitration of the dispute, alleging the following complaint:

> [Mr. Rodriguez], employed at [the School's premises] as a porter for three years, claims he was unjustly sent home on September 5, 2006 and was unjustly suspended pending investigation effective September 29, 2006.
>
> We are claiming reinstatement to his prior position with full back pay, benefits, seniority and contributions to the benefit funds lost by his unjust termination.

(Smith Aff., Exh. A, Award at p. 2.)

The Union's letter to the OCA failed to state that Mr. Rodriguez had been terminated, effective November 21, 2006, when he failed to report to work pursuant to an agreement between the Union and the School which provided that he would report to work on November 13, 2006. (See id.)

**The First Session of the Arbitration, at which the School**
**Appeared with Counsel, and Communications with**
**OCA Concerning the Scheduling of the Completion of the Arbitration**

The hearing was initially scheduled for January 30, 2007, pursuant to a Notice dated December 20, 2006 issued by the OCA to the School. (Frank Aff., Exhibit 1.) On January 30, 2007, the School's counsel appeared at the OCA's office and entered his appearance on behalf of the School. (Frank Aff. at ¶ 4.) The Union's counsel, Lia Fiol-Matta, also appeared;

however the Union Business Agent, Gordon Olekanma, failed to appear. (Id.) The OCA agreed to the Union's request that the hearing be adjourned to March 22, 2007, at 9:30 a.m.[2]

On February 1, 2007, the OCA issued a Notice of hearing for March 22, 2007 at 9:30 a.m. (Frank Aff., Exhibit 2.) Although the OCA knew that the School was represented by counsel, the OCA did not serve the School's counsel with the February 1, 2007 Notice in accordance with CPLR 2103(b) and 7506(d). (Frank Aff. at ¶ 5.) However, on information and belief, the Union's counsel was served with the February 1, 2007 Notice. (See Frank Aff., Ex. 2, noting that a copy was sent to the Union, whose counsel is located at the same address.)

On information and belief, on or about February 21, 2007, the OCA unilaterally issued an "Amended Notice of Adjournment," changing the hearing time on March 22, 2007 from 9:30 a.m. to 1:15 p.m. (Frank Aff., Exhibit 3.) The OCA did not serve the School's counsel with the change, but, on information and belief, did serve the Union's counsel. (See id.)

On March 20, 2007, the School's counsel first learned of the Amended Notice. (Frank Aff. at ¶ 7.) He immediately sent a letter by fax to Ms. Dawn E. Cervi, an OCA Administrator, objecting to the Amended Notice because it changed the hearing time without prior consultation with counsel. (Frank Aff., Exhibit 4.) Counsel advised the OCA that he had a scheduling conflict with the new time and requested that the arbitration hearing be rescheduled for a mutually convenient date. (See id.)

By notice dated March 26, 2007, the hearing was rescheduled by Ms. Cervi of the OCA to April 11, 2007 at 9:30 a.m. (Frank Aff., Exhibit 5.) Once again, the OCA failed to serve this notice on the School's counsel, but, on information and belief, did serve the Union's

---

[2] Contrary to the statements in the Award, there were no efforts made to resolve the dispute at that time and there was no claim of an emergency by the Union's counsel. (Frank Aff. at ¶ 4.)

counsel. (See id.) Despite knowing that the School was represented by counsel, Ms. Cervi –
who on information and belief is a Union employee – failed to even seek a mutually agreeable
date for the School. (Frank Aff. at ¶ 8.)

On April 9, 2007, Anthony Smith learned that the hearing had been unilaterally
rescheduled to April 11, 2007 at 9:30 a.m. without the knowledge or consent of the School or its
counsel. (Smith Aff. at ¶ 15.) The School's counsel then called Ms. Cervi to inquire why he had
not received notice of the April 11, 2007 hearing. (Frank Aff. at ¶ 9.) Ms. Cervi responded that
employers' counsel are not entitled to notice, and that the OCA only serves the employer with
notices of hearings. (Id.) The School's counsel requested a postponement of the hearing
because he had a previously scheduled conflict, but Ms. Cervi said that she could not grant a
postponement without the Union's consent. (Id.)

The Union's counsel declined to agree to a postponement, but did agree to
participate in a call with an arbitrator. (Id.) The parties had a conference call with another
arbitrator, at which time the School's counsel explained that he had a conflict on the scheduled
day. (Id.) That arbitrator said that he could not act on the School's request for a postponement,
and that the request could only be heard by Arbitrator Levine at the next hearing. (Id.)

The School's counsel then immediately sent a letter by fax to Ms. Cervi again
objecting to the unilateral scheduling of the arbitration. (Frank Aff., Exhibit 6.) By letter dated
April 9, 2007, the Union's counsel objected to the School's counsel's request for an adjournment
of the April 11, 2007 hearing. (Frank Aff., Exhibit 7.) In her letter, the Union's counsel argued
that the School had an obligation to notify counsel of the date of any hearings, and if the
School's counsel was unavailable, that was the School's problem. As explained below, the
Union's assertions fail as a matter of law.

**The Arbitrator's Refusal to Grant the School an
Adjournment Even Though the School's Counsel Did Not
Receive Notice, Was Not Present And Was Unavailable**

Due to the School's counsel's pre-existing conflicting professional engagement
and based on the advice of another OCA arbitrator that an adjournment would have to be
requested before Arbitrator Levine, Mr. Smith, the School's witness, appeared on April 11, 2007,
without counsel present, to request an adjournment and to ensure that the School would not be
defaulted. (Smith Aff. at ¶ 15; Frank Aff. at ¶ 12.)  At that time, Arbitrator Levine asked Mr.
Smith if the School was ready to proceed with the hearing, and he clearly answered no because
the School's attorney had another engagement and was not available. (Smith Aff. at ¶ 16.)  Mr.
Smith also made it clear to the Arbitrator that notice of the April 11th hearing date had not been
sent to the School's counsel and that he had only recently learned of the hearing date. (Id.)

The Union objected to the School's request for an adjournment of the hearing,
even though it knew full well that the School's counsel was not present and that Mr. Smith did
not wish to proceed without the School's counsel present. (Id. at ¶ 17.)  The Arbitrator refused
to adjourn the hearing, even though the School's counsel was not present. (Id. at ¶ 18.)  The
Union's counsel argued that the Agreement between the School and the Union does not require
the School to have counsel, to which the Arbitrator replied "[but] counsel has appeared on behalf
of the School." (Id.)

Mr. Smith then stated that he needed to call counsel. (Id. at ¶ 19.)  He attempted
to reach counsel, but was unsuccessful. (Id.)  He then went back into the hearing, explained that
he could not reach counsel, and that if the hearing proceeded, he would be at a disadvantage
without the School's counsel present. (Id. at ¶ 20.)  Even though Arbitrator Levine was
cognizant that counsel had previously appeared on behalf of the School (thereby rejecting the

Union's contention that the parties' Agreement somehow dispensed with the necessity of counsel for one of the parties being present), she stated to the School's witness that if he did not put on the School's case, she would enter a default judgment against the School and would find for the Union. (Id.)

**The April 11, 2007 Hearing**

In an opening statement, Mr. Smith, the School's witness, reiterated that he did not wish to proceed without the School's counsel, and that he was going forward only because he felt he had no other choice. (Id. at ¶ 21.) As Mr. Smith explains in his affidavit, as the arbitration continued, he felt totally overwhelmed by the proceedings and did not feel that he was adequately representing the School's position; for example, he even had difficulty presenting evidence that Mr. Rodriguez had been terminated on November 21, 2006 for his failure to show up for work during the week of November 13, 2006. (Id. at ¶¶ 22-23.) He also was not able to cross-examine Mr. Olekanma and Mr. Rodriguez after they provided untruthful testimony. (Id. at ¶ 22.)

**The Arbitration Award**

Arbitrator Levine issued an Award, dated May 1, 2007, in favor of the Union. (See Smith Aff., Exh. A., Award.) Realizing that her actions in depriving the School of the assistance of counsel during the April 11, 2007 hearing constituted misconduct, Arbitrator Levine went out of her way in her written Award to try to counter any suggestion that the School had been prejudiced. She first writes that "although [Mr. Smith indicated] he would prefer to have his counsel present, he [also indicated that he] was prepared to present [the School's] case." (Award at p. 5.) That is incorrect. Instead, Mr. Smith made it clear that he believed he was

being forced to proceed with the arbitration, desired to have his counsel present, and was proceeding "under duress." (Smith Aff. at ¶¶ 2, 26.)

Arbitrator Levine then went on to state in the Award that "[a]t the hearing, full opportunity was afforded to the parties to present evidence and argument, and to examine and cross-examine witnesses," and that "[a]t the conclusion of the hearing, the parties indicated that they had presented their respective cases in full." (Award at p. 6.) Those statements are also incorrect. Mr. Smith is adamant that he did not indicate that he had "full[y]" presented the School's case, nor does he believe that he had a full opportunity to present evidence and argument, and to examine and cross-examine witnesses – he is not an attorney and that is why the School retained an attorney to represent it in this matter. (Smith Aff. at ¶¶ 26-29.)

## ARGUMENT

### THE ARBITRATOR VIOLATED THE SCHOOL'S RIGHTS BY DEPRIVING IT OF ITS UNWAIVABLE STATUTORY RIGHT TO HAVE COUNSEL PRESENT

As discussed above and in the accompanying Frank Aff., the School's counsel was not present for the April 11, 2007 hearing scheduled by OCA because he had not received notice of that hearing, and had another professional engagement scheduled for that date. OCA stated, wrongly, that it was not obligated to notify counsel. Despite the fact that the OCA knew, since January 30, 2007, that the School was represented by counsel, the OCA deliberately failed to give counsel notice of the hearing. Counsel did not learn until April 9, 2007 that a hearing had been scheduled for April 11, 2007, and, by that point, it was too late to reschedule his prior professional commitment.

When Mr. Smith, the School's witness, appeared on April 11, 2007 without counsel to explain that notice had not been provided to the School's counsel and to seek an

adjournment, Arbitrator Levine did not even inquire whether the School's counsel had been given notice. Rather, Ms. Levine, at the Union counsel's request, simply refused to grant an adjournment. The Arbitrator, as requested by Union counsel, then directed the arbitration to proceed without the School's counsel being present. The School's strenuous objection was ignored. Proceeding without counsel present prejudiced the School, and deprived it of due process and its statutory right under CPLR 7506(d).

A.    **Counsel Did Not Receive Notice of the Hearing**

CPLR 7506(d) provides that "[i]f a party is represented by an attorney, papers to be served on the party *shall be served* upon his attorney." (Emphasis supplied.)    The Courts have construed CPLR 7506(d) strictly.    See, e.g., William Floyd Union Free School District v. William Floyd United Teachers, 149 A.D.2d 715, 716, 540 N.Y.S.2d 508, 509 (2d Dep't 1989) (finding arbitrator's notice mailed to the petitioner ineffective).

Indeed the Court of Appeals, in the seminal case, Bianca v. Frank, 43 N.Y.2d 168, 173, 401 N.Y.S.2d 29, 31 (1977) held:

> once a party chooses to be represented by counsel in an action or proceeding, *whether administrative or judicial,* the attorney is deemed to act as his agent in all respects relevant to the proceeding. Thus any documents, *particularly those purporting to have legal effect on the proceeding,* should be served on the attorney the party has chosen to handle the matter on his behalf. This is not simply a matter of courtesy and fairness; it is the traditional and accepted practice which has been all but universally codified (see, e.g., CPLR 2103(b); CPLR 7506(c); and Executive Law § 168).

(Emphasis supplied.)    The Bianca Court went on to state that "a legislative enactment could specifically exclude the necessity of serving counsel, but any intention to depart from the standard practice must be clearly established and stated in unmistakable terms." (Id.)

Here the Arbitrator accepted the Union's argument that it was irrelevant that counsel had not been provided with notice by the OCA. In the Union's view, because the

11

Agreement between the Union and the School did not mandate that OCA provide notice to the School's counsel of the scheduling of an arbitration (see Smith Aff., Ex. A, Award at p. 3), the statutory command of CPLR 7506(d) was not applicable. The Arbitrator approvingly cited the Union's position in the Award and did not even consider the Statute or well established judicial precedent. (See Smith Aff., Ex. A, Award at p. 3.)

As an initial matter, if the Agreement did so provide, that provision would be illegal or of no legal effect, as it would directly violate CPLR 7506(d). The Union cannot point to any statutory provision where the legislature has "specifically exclude[d] the necessity of serving counsel" with notice of the scheduling of an arbitration. Bianca, supra, 43 N.Y.2d at 173, 401 N.Y.S.2d at 31. Indeed, the Agreement even provides that "[i]f any provision of this Agreement shall be held illegal or of no legal effect, *it shall be deemed null and void* without affecting the obligations of the balance of this Agreement." (Smith Aff., Ex. B, Agreement at p. 16 (¶ 43) (emphasis supplied).) In sum, the OCA must change the way it provides notice of the scheduling of arbitrations when a party is represented by counsel.

The OCA's March 26, 2007 Notice to the School was insufficient to provide the School's counsel with notice of the April 11, 2007 hearing. At a minimum, this should have required the Arbitrator to grant the School's request for a reasonable adjournment.[3]

**B.    The Arbitrator Engaged in Misconduct by Depriving the School of Its Right to Counsel**

New York has long sanctioned arbitration as an effective alternative method of settling disputes as long as arbitrators act within their jurisdiction and the integrity of the process, as opposed to the correctness of the individual decision, is zealously safeguarded. Goldfinger v.

---

[3] By changing the scheduled time and date, the OCA changes the arbitrator selected to hear a dispute. Thus the Union – without agreement of the Employer – picked the Arbitrator.

Lisker, 68 N.Y.2d 225, 230, 508 N.Y.S.2d 159, 161 (1986) (citations omitted).  Arbitrators are

governed by standards:

> [arbitrators] are expected to "faithfully and fairly" hear the controversy
> over which they have been chosen to preside (CPLR 7506 [a]) and
> ought to conduct themselves in such a manner as to safeguard the
> integrity of the arbitration process.  Arbitrators must afford the parties
> the opportunity to present evidence and to cross-examine witnesses
> (CPLR 7506 [c]) and may act only upon proof adduced at a hearing of
> which due notice has been given to each party (CPLR 7506 [b], [c]). …
> Although courts generally will not interfere with the judgment of
> arbitrators, arbitration awards are not to be confirmed without question
> where there is evidence of misconduct prejudicing the rights of the
> parties.

(Id. at 230-31, 508 N.Y.S.2d at 161-62 (other citations omitted; emphasis supplied).)

      CPLR 7511 provides the mechanism to vacate an award, providing in pertinent

part that an arbitration award "shall be vacated" if the court finds that the rights of the

complaining party "were prejudiced by corruption, fraud, or misconduct in procuring the award."

      The right to counsel in arbitration proceedings is enshrined in our law, and is

codified at CPLR 7506(d), which states:

> A party has the right to be represented by an attorney and may claim
> such right at any time as to any party of the arbitration or hearings
> which have not taken place.  This right may not be waived. …

(Emphasis supplied.)

      Therefore, when arbitrators deny a party the assistance of counsel, the Courts

invariably find that such actions are per se prejudicial and constitute misconduct, mandating

vacation of an award.  See, e.g., Nastasi v. Artenberg, supra, 130 A.D.2d at 470, 515 N.Y.S.2d at

52; Sartiano v. Becker, 119 A.D.2d 656, 501 N.Y.S.2d 94, 95 (2d Dep't 1986), lv. to appeal

dismissed, 68 N.Y.2d 806, 506 N.Y.S.2d 1036 (1986); Mikel v. Scharf, 85 A.D.2d 604, 444

N.Y.S.2d 690, 691 (2d Dep't 1981); Coty Inc. v. Anchor Constr., Inc., 2003 NY Slip Op

50013U, 2003 N.Y. Misc. LEXIS 13 at *15-16, 2003 WL 139551 (Sup. Ct. N.Y. Co. Jan. 8,

13

2003) (a copy is attached for the Court's convenience), aff'd, 7 A.D.3d 438, 776 N.Y.S.2d 795 (1st Dep't 2004).

      The Courts have also rejected arguments that a party has waived its right to counsel, or attempts by an arbitrator to condition arbitration on the waiver of a right to counsel, given the language of CPLR 7506(d) that any waiver or attempted waiver is ineffective.  See Volpe v. Cortes, 16 A.D.3d 675, 676, 792 N.Y.S.2d 536, 537 (2d Dep't 2005).

      By refusing to adjourn the hearing so that the School's counsel could be present, Arbitrator Levine committed misconduct as a matter of law.  Rather than conducting herself "in such a manner as to safeguard the integrity of the arbitration process" (Goldfinger, supra, 68 N.Y.2d at 231, 508 N.Y.S.2d at 162), Arbitrator Levine turned the arbitration into a sham and then falsely stated in the Award that the School's witness had no problem with proceeding without the assistance of the School's counsel, and that he indicated that he had a full opportunity to participate in the arbitration and to put on the School's case.  As a matter of law, the Award should be vacated.

## C.    The Arbitrator's Misconduct Prejudiced the School

      An arbitrator's refusal to grant an adjournment will be overturned when the refusal results in the failure of the arbitrator to hear pertinent and material evidence, resulting in prejudice to the petitioner.  See Ins. Co. of N. Am. v. St. Paul Fire & Marine Ins. Co., 215 A.D.2d 386, 387, 626 N.Y.S.2d 232, 233 (2d Dep't 1995); Omega Contracting, Inc. v. Maropakis Contracting, Inc., 160 A.D.2d 942, 943, 554 N.Y.S.2d 664, 665-66 (2d Dep't 1990) (the Court vacated an award because "[a]fter the petitioner rested, the arbitrator denied the request of the appellant's counsel for an adjournment to present rebuttal evidence").

As explained in detail above and in the Smith Aff., Mr. Smith felt totally overwhelmed by the proceedings and had difficulty presenting straightforward evidence, not to mention cross-examining witnesses. (Smith Aff. at ¶¶ 22-23.) The School was prejudiced when the Arbitrator refused to adjourn the hearing, and deprived the School of the assistance of counsel.

Accordingly, the Award should be vacated.

## CONCLUSION

Based on the misconduct of the arbitrator and the prejudice that misconduct caused the School, the Award should be vacated.

Dated: New York, New York
      June 12, 2007

EPSTEIN BECKER & GREEN, P.C.

By: _____

    James S. Frank
    J. William Cook
    *Attorneys for Petitioner*
    250 Park Avenue
    New York, New York  10177-1211
    (212) 351-4500

LEXSEE 2003 NY MISC LEXIS 13

[*1] In the Matter of the Application of COTY INC., Petitioner, v. ANCHOR CONSTRUCTION, INC., Respondent.

Index No. 601499-02

SUPREME COURT OF NEW YORK, NEW YORK COUNTY

2003 NY Slip Op 50013U; 2003 N.Y. Misc. LEXIS 13

January 8, 2003, Decided

**NOTICE:**    [**1]    THIS OPINION IS UNCORRECTED AND WILL NOT BE PUBLISHED IN THE OFFICIAL REPORTS.

**SUBSEQUENT HISTORY:** Affirmed by Coty Inc. v. Anchor Constr., Inc., 2004 N.Y. App. Div. LEXIS 7202 (N.Y. App. Div. 1st Dep't, May 25, 2004)

**DISPOSITION:**    Award vacated and proceeding remanded for new arbitration conducted before different panel.

**COUNSEL:** Brown, Raysman, Millstein, Felder & Steiner.

(John J. Gallagher of counsel), for Petitioner.

Howard Blum, for Respondent.

**JUDGES:** Hon. James A. Yates, J.S.C.

**OPINION BY:** James A. Yates

**OPINION**

Decision and Order

[*2] Petitioner Coty Inc. (Coty), a manufacturer and seller of fragrances and cosmetics, initiated this Article 75 proceeding, seeking confirmation of an arbitration award. Respondent Anchor Construction (Anchor), a construction services company, moved to vacate the award based on arbitrator misconduct. In the award, Anchor was directed to pay Coty damages in the amount of $ 2,399,635.36 plus one-half of arbitration expenses.

A hearing commenced before a panel of three neutral arbitrators in November, 2001. After five days of hearing, but before the presentation of evidence had concluded, upon learning that Anchor had failed to pay or pre-pay its share of arbitration costs, including the [**2]

arbitrators' fees, the arbitrators ruled that Anchor would no longer be permitted to actively participate in the proceedings, but could only attend and listen to evidence presented by Coty at the hearing. As well, the panel declared that, in rendering an award, they would decide the case based only upon Coty's evidence "heretofore and hereafter" presented. Coty was then permitted to continue presenting evidence on the question of damages for two additional hearing dates without Anchor's participation. Anchor argues that the arbitrators wrongfully denied it the right to participate in the proceedings and the right to a fundamentally fair hearing. Anchor also maintains that it did not intentionally refuse to pay the arbitrators, but that it was financially unable to make the payments at the time. Coty argues that Anchor waived or relinquished whatever rights it had to participate when it failed to pay one-half the required fees and compensation for the arbitrators' services. The panel ruled that it did not matter whether [*3] the failure to pay arose from true financial difficulties or was intentional, since financial inability to pay the arbitrators was "no excuse."

Background

[**3] In November, 1999, Anchor was hired by Coty to act as construction manager for the remodeling and repair of office space located at 1 Park Place. The agreement between the parties contained an arbitration clause for any dispute arising out of the contract. It is alleged by Coty that Anchor breached its contractual duties at considerable expense to Coty. Coty terminated Anchor's involvement in the project on November 28, 2000. On April 2, 2001, Coty filed for arbitration with the American Arbitration Association (AAA), claiming losses and cost overruns in excess of $ 7 million. Anchor countered two days later with its own demand for arbitration, claiming $ 3,100,043 in unpaid fees. Both sides agreed to abide by the AAA's Construction Arbitration Rules, in effect Sept.1, 2000. Three neutral arbitrators were selected to conduct the hearings. Compensation for

2003 NY Slip Op 50013U, *; 2003 N.Y. Misc. LEXIS 13, **

the three arbitrators came to $ 7, 250 per day, which was to be borne equally by the parties, subject to final allocation in the award. After preliminary discovery proceedings and a review of the claims by the panel, ten days of hearings were scheduled. Accordingly, the parties were required to pay, in advance, certain fees, expenses [**4] and anticipated compensation for the panel, totaling more than $ 80,000. On October 9, 2001, [*4] prior to commencement of the hearings, Melissa R. Switzer, the AAA Case Manager, wrote to advise the parties that Anchor had not yet paid its share, $ 44,750, and that, "pursuant to R-54 of the Construction Rules, the Panel of neutrals may suspend administration of a case for non-payment." ¹ On October 11th, Coty's counsel responded that Coty had paid its share and "if your letter to the arbitrators does not make clear that it is Anchor, and not Coty, who has failed to pay the AAA's fees, I intend to write to the arbitrators and make that fact clear." The Case Manager replied the next day by "reminding the parties that the AAA policy does not provide for direct communication with arbitrators. All correspondence relating to billing should be sent directly to the undersigned, per Section R-51 of the Rules." ² In the same letter, the parties were advised, again, that, without payment, "the arbitrators may order the suspension or termination of the proceedings." Nonetheless, the arbitration proceeded and hearings were held on the issue of liability were held on November 6, 7, 8, 12-13, 2001. Each party [**5] was present and represented by counsel. The hearings were scheduled to continue in December.

> 1   Construction Industry Dispute Resolution Procedures, R-54. ("If arbitrator compensation or administrative charges have not been paid in full, the administrator may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.").

> 2   R-51, paragraph 3 ("Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator."); see also Grendi v LNL Const. Management, Inc., 175 A.D.2d 775, 573 N.Y.S.2d 515 [1st Dept 1991] (disqualifying a panel on grounds that an appearance of impropriety existed where the case administrator advised the panel that one side was unable to pay its fees and the other side was unwilling to advance payment for the indigent party).

[*5] [**6] On November 13th the Case Administrator again wrote to complain that the fees had not been

paid and that the arbitrators were empowered to suspend the proceedings. Further, the Administrator advised the Chairman of the panel "that one of the parties insists that the panel be informed as to the status of deposits or payments made to the Association by each party, despite [the Administrator's] advices that such a communication would be improper. (See Pet. Supp. Aff. in Support of its Motion to Confirm, Ex. 13, Letter to Ms. Switzer, dated November 30, 2001). The panel member replied,

"The panel requests that you most emphatically reaffirm the Association's advices and further advise the parties that the arbitrators have no interest in learning anything about the status of any party's deposits, payments, or any issues going to compensation of the arbitrators, other than whether or not sufficient deposits are on hand for a scheduled hearing to proceed, and that the arbitrators prohibit any communications, direct or otherwise, intended to communicate any such prohibited information to any panelist."

id.

Anchor changed counsel and requested an adjournment, which [**7] was granted. By letter, dated December 6, 2001, the panel, through the AAA Case Manager scheduled ten [*6] days of hearings, to commence on January 22, 2002 and to conclude on March 21, 2002. On January 7, 2002, the AAA Case Manager, via letter, again demanded payment and warned of possible suspension of the proceedings for non-payment.

On January 10, 2002, Coty's attorney objected to possible suspension. Coty moved for default against Anchor for non-payment or, in the alternative, that Coty be permitted to continue presenting evidence at four more days of sessions, for which it had already paid in advance, "without Anchor." Counsel again asked that his request, including the information that it had paid its share of fees while Coty had not, be delivered directly to the panel.

On January 15, 2002, counsel for Anchor wrote to the Case Manager, claiming that its inability to pay the fees was the result of "financial difficulties" partly due to the litigation itself and was not an "intentional refusal." Counsel asked that Coty "be compelled to present its case on the merits, and to have its witnesses be subjected to cross examination."

On January 16, 2002, the Case Manager advised the parties [**8] that "the arbitrators have canceled all upcoming hearings until full payment has been made." The letter further reminded the parties that Rule 54 permits one party to advance required payment in anticipation of adjustment in the award. Counsel for Coty responded that day, [*7] in two successive letters, with the argument that Anchor was in default and that the

panel should be so advised so that it could rule on his motion to proceed without Anchor. Coty did not want to advance payment for Anchor in order to continue the hearings.

On January 22, 2002, counsel for Anchor reiterated that its inability to pay was not intentional. He objected to Coty's motion to proceed without Anchor's participation, requesting an "opportunity to defend and present evidence to offset any potential award." He pointed out that Rule 30 permitted one side to go forward when the opposing party "fails to be present." However, in this case, Anchor had been present and wished to remain a participant in the proceedings.

On January 23, 2002, the Case Administrator advised the parties that she was forwarding the January 16th and January 22nd correspondence, including information that Coty had paid the fees in full [**9] while Anchor had not, to the panel. [3]

> 3  Apparently the January 10th letter by Coty's counsel and the January 15th letter by Anchor's counsel were forwarded as well since they were referenced later in the panel's decision.

By decision two days later, dated January 25, 2002, the panel granted Coty's motion and ordered Anchor defaulted. The panel ruled that the proceedings would continue, as Coty requested, on February 14th and 15th, but, according to the decision, "The arbitrators will independently evaluate the quality and weight of all of the evidence [*8] heretofore and hereafter presented *by the Claimant* [Coty] in rendering any award herein (emphasis supplied) ." At the next two hearing dates, Anchor would be permitted to "attend, audit, and record at its own expense and without inconvenience to the parties or the panel * * * but * * * it [would] not be permitted to actively participate * * * except to the extent, if any, that a defaulting litigant would be permitted to participate in assessment proceedings [**10] under CPLR § 3215 [b], or as the arbitrators, in their sole and arbitrary [sic] discretion, may allow. "

The panel never resolved whether the failure to pay was intentional or due to financial inability. To the contrary, "for the sake of determining [the] motion" the panel "presumed" that Anchor's "financial circumstances" were "as stated," i.e. the failure to pay was not an intentional avoidance of the obligation to pre-pay fees. Nonetheless, the panel ruled that "financial inability * * * is no excuse, whether or not intentional."

On February 5, 2002, the Case Manager notified the parties that the hearings would proceed on February 14 and 15, 2002. By reply on February 8th, counsel for Anchor notified the Case Manager that it wished to "withdraw as counsel for Anchor."

On April 11, 2002, the panel found for Coty in the amount of $ 3,177,536.13 plus interest. This was offset by an amount due Anchor, $ 1,055,612.48. The net amount due Coty, therefore was $ 2,121,923.65 plus 9% interest per annum from January 1, 2001 to [*9] the date of the award. In addition, the panel directed that the costs of arbitration be borne equally. Anchor was directed to pay Coty [**11]  $ 33,370.75 for arbitration fees, expenses and compensation. [4]

> 4  Coty was permitted to introduce evidence at the hearing that it had paid the AAA $ 51,010.00. *See Claimant Coty Inc.' s Post-Hearing Mem.* at 25.

In all, the evidence at the hearings consisted of the testimony of twelve witnesses and 137 exhibits presented by Coty over the course of seven hearing dates (November 6,7,8,13 and 14, 2001 and February 14-15, 2002). Anchor was not present for the final two days of hearings.

## Conclusions of Law

When parties to a contract expressly opt to settle differences by arbitration rather than resort to the courts, they cannot be heard to complain later, in court, that the procedures of the forum or the decisions of the arbitrator were not fully in accord with prevailing law. ("Even where the arbitrator makes a mistake of fact or law * * * the award is not subject to vacatur 'unless the court concludes that it is totally irrational or violative of a strong public policy' and thus in excess of [**12] the arbitrator's powers." *Hackett v* [*10] *Milbank, Tweed, Hadley & McCloy,* 86 N.Y.2d 146, 155, 630 N.Y.S.2d 274, 654 N.E.2d 95 [1995] (internal citations omitted)). Nonetheless, arbitration proceedings are not entirely free from review. They are constrained, to a limited extent, by statute, by due process and by the forum's own rules. In the instant case, the panel transgressed in all three respects.

### A. Statutory Constraints

CPLR § 7506 [c] provides that, in any arbitration proceeding, "The parties are entitled to be heard, to present evidence and to cross-examine witnesses." As well, CPLR § 7506 [d] provides, "A party has the right to be represented by an attorney and may claim such right at any time as to any part of the arbitration or hearings which have not taken place. This right may not be waived." Finally, CPLR § 7511 requires a court to vacate an award where rights of a party were prejudiced by "corruption, fraud or misconduct in procuring the award."

Anchor was precluded, by the panel's decision of January 25, 2002, from continued, active participation in

Case 1:07-cv-05695-JSR    Document 1-6    Filed 06/14/2007    Page 22 of 27

Page 4

2003 NY Slip Op 50013U, *; 2003 N.Y. Misc. LEXIS 13, **

the proceedings. [**13] This meant that for some portion of the proceedings, Anchor was not permitted its statutory right "to be heard, to present evidence [or] to cross-examine witnesses." Anchor did participate in five out of seven days of hearing. However, the direct consequences of the preclusion order upon the [**11] proceedings as a whole are difficult to gauge from the record. In the first five days, Coty had presented some, but not all of its case. Coty needed at least two more days of hearing, without cross examination, to complete its direct case. Anchor asked to be allowed to participate, to cross-examine the witnesses presented by Coty in February, and as well, to present a case of its own. Before the preclusion order had issued, and after the first five days of hearing, the panel had scheduled ten additional days of hearing. After issuing the preclusion order, the panel scheduled only two days to wrap up the proceedings. While the record does not clearly demonstrate what evidence was precluded, [5] at the very least, it is a fair inference that Anchor was denied the right to participate in a meaningfully significant portion of the hearings since witnesses deemed essential by Coty to complete its case [**14] were allowed to testify without examination by Anchor. No evidence was permitted to be presented by Anchor in support of its counterclaim after the preclusion order, and, as well, the panel ruled that it would only consider "evidence heretofore and hereafter presented by Claimant [Coty]," thereby declaring that any evidence presented by Anchor, before the preclusion order, would be disregarded. It would be extremely difficult to say, and Coty does not contend, that the hearings had essentially been concluded, or that, since Anchor had participated in a meaningful way before the preclusion order, the preclusion order did not significantly affect the [*12] proceedings. In all, Anchor was denied its statutory right to participate under CPLR § 7506 [c] and the denial was not merely incidental to an otherwise complete hearing.

---

5  Seven witnesses had testified on direct examination, but without cross examination prior to the preclusion order. *Respondent's Aff. in Opposition,* Ex.3, Letter to Steven Miller, dated January 9, 2002 . Anchor was not permitted, after the order, to cross-examine those witnesses. Apparently, as well, five more witnesses, including expert witnesses, were called by Coty after the preclusion order.

[**15]  As well, Anchor was denied its unwaivable right to counsel. CPLR § 7506 [d]. It is not sufficient that Anchor's attorney was permitted to "attend and audit." The right to counsel provided by statute bespeaks meaningful participation - the right of counsel to speak, to object, to argue and to advocate on behalf of a client before the panel as the case is presented by the opposing side. The right to counsel becomes meaningless if coun-

sel is consigned to quiet attendance as a mere observer at the proceedings. *Mikel v Scharf,* 105 Misc 2d 548, 432 N.Y.S.2d 602, *affd,* 85 A.D.2d 604, 444 N.Y.S.2d 690 [2d Dept 1981] (vacating an award where the panel refused to acknowledge the attorney, stopping his attempts to speak or participate in the proceeding, and not permitting him to ask questions, or present evidence); *see also United States v Cronic,* 466 U.S. 648, 659, n 25, 80 L. Ed. 2d 657, 104 S. Ct. 2039 [1984] (holding, in the context of a criminal proceeding, "This Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting [**16] the accused during a critical stage of the proceeding; *see e. g. Geders v United States,* 425 U.S. 80, 47 L. Ed. 2d 592, 96 S. Ct. 1330 [1976]; *Herring v New York,* 422 U.S. 853, 45 L. Ed. 2d 593, 95 S. Ct. 2550 [1975]; *Brooks v Tennessee,* 406 U.S. 605, 612-613, 32 L. Ed. 2d 358, 92 S. Ct. 1891 [1972]; *White v Maryland,* 373 U.S. 59, 60, 10 L. Ed. 2d 193, 83 S. Ct. 1050 [1963] (per curiam); *Hamilton v Alabama,* 368 U.S. 52, 55, 7 L. Ed. 2d 114, 82 S. Ct. 157 [1961]; *Ferguson v Georgia,* 365 U.S. 570, 5 L. Ed. 2d 783, 81 S. Ct. 756 [1961]; *Williams v Kaiser,* 323 U.S. 471, 475-476, 89 L. Ed. 398, 65 S. Ct. 363 [1945]; *see generally Elmore v Plainview-Old Bethpage Central School Dist.,* 273 A.D.2d 307, 308, 708 N.Y.S.2d 713 [2nd Dept 2000] (vacating a panel's finding [*13] where one of the parties was not permitted to consult with counsel during breaks in the proceedings). By directing that counsel could not examine the witnesses or speak to the panel, the arbitrators wrongfully denied Anchor its statutory right to counsel. *See also Napolitano v Branks,* 128 A.D.2d 686, 513 N.Y.S.2d 185 [**17] [2d Dept 1986] (directing counsel not to examine a witness during an inquest). [6]

---

6  Interestingly enough, the panel ruled that it would "be guided by, but in no wise bound, by NY CPLR § 3215 * * * The Claimant may proceed to prove the balance of its case as it may be advised, by assessment, in form and substance similar to that provided for under CPLR § 3215[b]." *Reply Aff. In Further Suppport of Coty's Motion to Confirm and In Opp. To Cross-Motion to Vacate,* Ex. A, Order of the Panel, dated January 25, 2002. However, the rule is clear, that, following a default judgment, it is improper to deny counsel or a party an opportunity to participate in the ensuing assessment. *Napolitano v Branks,* 128 A.D.2d 686, 513 N.Y.S.2d 185, *supra; Rokina Opt. Co., Inc. v Camera King, Inc.,* 63 N.Y.2d 728, 480 N.Y.S.2d 197, 469 N.E.2d 518 [1984]. Thus, the panel selectively opted to provide Coty with procedural rights provided by CPLR § 3215, while denying Anchor

Case 1:07-cv-05695-JSR    Document 1-6    Filed 06/14/2007    Page 23 of 27

Page 5

2003 NY Slip Op 50013U, *; 2003 N.Y. Misc. LEXIS 13, **

the counterbalancing benefit of protections required by the same statute.

[**18] Finally, the panel's award should be set aside because the award was procured by arbitrator misconduct. CPLR § 7511 [b] [i], [ii]. Within two days of learning that Coty had paid the panel's fees, but Anchor had not, the panel produced a decision declaring that it would consider Coty's evidence alone and bar Anchor's participation in the proceedings. While it is true that arbitration panels are afforded great latitude in determining what evidence they will hear, arbitrators are guilty of affirmative misconduct when they refuse to hear evidence pertinent and material to the controversy in "bad faith." *United Paperworkers Intern. Union v Misco, Inc.*, 484 U.S. 29, 39-40, 98 L. Ed. 2d 286, 108 S. Ct. 364 [1987]; *Astoria Med. Group v Health Insurance Plan*, 11 N.Y.2d 128, 137, 227 N.Y.S.2d 401, 182 N.E.2d 85 [1962] (finding "evidence of * * * corruption" when an arbitrator is deaf to the testimony or blind to the evidence presented). [*14] The panel had a direct monetary interest in being paid. Ruling that they would only hear the side that paid them was improper. *Matter of Katz [Uvegi]*, 18 Misc 2d 576, 583 [**19] [Pette, J.], *aff'd* 11 A.D.2d 773 [2d Dept 1960] (vacating an award where the arbitrators demanded fees directly and listened to one party's case in the absence of the other party); *see also Professional Staff Congress/City University of New York v Bd. of Higher Education*, 39 N.Y.2d 319, 323, 383 N.Y.S.2d 592, 347 N.E.2d 918 [1976] (citing *Katz* with approval and holding " One form of misconduct is the refusal to hear pertinent and material evidence.").

A long series of cases has pointed to the obvious peril to the fairness of the proceedings when arbitrators become directly involved in discussions with parties about their fees before the proceedings have concluded. *Grendi v LNL Const. Management Corp.*, 175 A.D.2d 775, 573 N.Y.S.2d 515 [1st Dept 1995]; *Catalyst Waste-to-Energy Corp. v City of Long Beach*, 164 A.D.2d 817, 560 N.Y.S.2d 22 [1st Dept 1990]; *Matter of Fischer*, 106 A.D.2d 314, 482 N.Y.S.2d 761 [1st Dept 1984]; *Matter of Double-M Const. Corp. v Central School Dist. No. 1*, 61 A.D.2d 982, 402 N.Y.S.2d 442 [2d Dept 1978]; *Albert Elia Bldg. Corp. v County of Niagara*, 8 A.D.2d 684, 184 N.Y.S.2d 392 [**20] [4th Dept 1959]. *Grendi* is closely analagous. In *Grendi, supra*, one party claimed it could not afford the arbitration fees. The AAA Case Administrator asked the other party to advance the fees. Unfortunately, this was communicated to the panel itself. The panel was disqualified because "the petitioners * * * should not have been placed in a position where they would feel compelled to accede to the AAA's request to pay the respondent's share of the arbitrator's fee for fear of adverse consequences". *id.* at 775. In *Grendi*, the mere fact [*15] that the arbitrator knew that a party had been asked to advance the fees for the opposing party was sufficient to call into question the arbitrator's impartiality. The Court recognized that *Grendi* was justified in fearing adverse consequences if it chose not to pay.

For that very reason, the Case Administrator here sought to insulate the panel from the negotiations. The Case Administrator advised Coty that it had the option of advancing the fees for Anchor in order to continue the proceedings. For several months, the Case Administrator refused Coty's counsel's demands that the panel be advised of the [**21] situation. To do otherwise, would have repeated the very error which caused the Appellate Division to disqualify the panel in *Grendi*. Apparently, as well, the panel itself recognized the potential problem, since, in its November 30th letter, it "emphatically" insisted that it had "no interest" in learning of the status of payments. Nonetheless, in four separate communications, Coty's counsel repeated his demand that the panel be advised that Coty had paid for past and future sessions while Anchor had not. (Letters to the Case Administrator dated October 11, 2001, January 10, 2002 and two separate letters, January 16, 2002).

If the solvent party in *Grendi* was justified in fearing adverse consequences if the panel knew that it might not pay more than its share of the arbitrator's fees, then surely Anchor, as a professedly indigent party, is justified in fearing adverse consequences [*16] flowed when the panel learned Anchor had not paid its own share of their fees.

The panel should not have been advised of the situation and should not have based its determination of how to proceed upon the information. *Grendi v LNL Const. Management Corp.*, 175 A.D.2d 775, 573 N.Y.S.2d 515 [**22] [1st Dept 1991]; *see also Montague Pipeline Technologies Corp. v Grace-Lansing & Grace Indus.*, 238 A.D.2d 510, 656 N.Y.S.2d 656 [2d Dept 1997]; *Catalyst Waste-to-Energy Corp. v City of Long Beach*, 164 A.D.2d 817, 560 N.Y.S.2d 22 [1st Dept 1990]; *Matter of Fischer*, 106 A.D.2d 314, 482 N.Y.S.2d 761 [1st Dept 1984]; *Kubarych v Siegel*, 156 Misc 2d 935, 595 N.Y.S.2d 293 [Sup Ct, NY County 1993].

**B. Due Process**

There exist two schools of thought with regard to the applicability of due process rights to private arbitration proceedings. *See generally*, Brunet, *Arbitration and Constitutional Rights*, 71 N C L Rev 81 [1992]. One school argues that the mere fact that courts review, confirm or set aside panel findings implicate the full panoply of rights which attend state action. The other, contends that a private contract to avoid litigation carries with it an acknowledgment that state action is not involved and, therefore, constitutional values are not to be super-

Case 1:07-cv-05695-JSR    Document 1-6    Filed 06/14/2007    Page 24 of 27

Page 6

2003 NY Slip Op 50013U, *; 2003 N.Y. Misc. LEXIS 13, **

imposed upon arbitral hearings. Without clearly resolving the issue, the Supreme Court has set aside an award, on a Due [**23] Process claim, [*17] where a panel member had a financial connection to one of the parties. *Commonwealth Coatings Corp. v Continental Cas. Co.,* 393 U.S. 145, 21 L. Ed. 2d 301, 89 S. Ct. 337 [1945]. Justice Black, in a plurality opinion, wrote that it was important that arbitrators be impartial because they "have completely free rein to decide the law as well as the facts and are not subject to appellate review." 393 US, at 149-150. *(e.g.* in the context of labor law arbitration, this less then perfect due process has been labeled "industrial due process." Brunet, *Arbitration and Constitutional Rights, supra* at 96.)

Similarly, in New York, in *Goldfinger v Lisker,* 68 N.Y.2d 225, 508 N.Y.S.2d 159, 500 N.E.2d 857 [1986] the Court of Appeals reasoned, "Precisely because arbitration awards are subject to such judicial deference, it is imperative that the integrity of the process, as opposed to the correctness of the individual decision, be zealously safeguarded."

The result is a requirement that, although "an arbitrator need not follow all the niceties observed by * * * courts * * * he [must] grant a fundamentally fair hearing. [**24] " *Bell Aerospace Co. Div. of Textron Inc. v Local 516, UAW,* 500 F.2d 921, 923 [2d Cir 1974]. A fundamentally fair hearing requires notice, an opportunity to be heard and to present relevant and material evidence and argument before the decision makers, and that the decision makers are not infected with bias. *Employers Ins. of Wausau v National Union Fire Ins. Co. of Pittsburgh,* 933 F.2d 1481, 1491 [9th Cir 1991] (fair hearing is based on notice, opportunity to be heard and to present evidence, and lack of biased decision [*18] making); *Sunshine Min. Co. v United Steelworkers of America,* 823 F.2d 1289, 1295 [9th Cir 1987] ("a hearing is fundamentally fair if it meets the 'minimum requirements of fairness'--adequate notice, a hearing on the evidence, * * * impartial decision") (quoting *Ficek v Southern Pacific Co.,* 338 F.2d 655, 657 [9th Cir 1964], *cert denied* 380 U.S. 988, 14 L. Ed. 2d 280, 85 S. Ct. 1362 [1965]); *Hoteles Condado Beach v Union de Tronquistas, Local 901,* 763 F.2d 34, 39 [1st Cir 1985] (arbitrator must give each party an adequate opportunity to present evidence and [**25] arguments).

The same standard applies in New York Courts. "While it is true that Federal courts have expressly held that fundamental unfairness can constitute a ground for vacatur of an arbitration award independent of [statutory] grounds, fundamental fairness is not to be equated with the full panoply of judicial procedural safeguards and legal 'niceties' of the courtroom. Due process in arbitration means satisfying 'minimal requirements of fairness.' That standard is met when the parties have had adequate

notice and opportunity to be heard by unbiased decisionmakers." *McMahan & Co. v Dunn Newfund I, Ltd.,* 230 A.D.2d 1, 4-5, 656 N.Y.S.2d 620 [1st Dept 1997] (Internal citations omitted).

Here, Anchor was denied a "fundamentally fair" hearing. As discussed above, Anchor was denied the opportunity to be heard, the opportunity to present evidence and the right to be heard by an unbiased decision maker.

[*19] **C. Appearance of Impropriety**

The question arises as to whether Anchor needs to demonstrate that actual partiality prejudiced the final award. On the one hand, it could be argued that the denial of important procedural rights - an opportunity to present [**26] evidence, examine witnesses and to have counsel heard - in and of itself, constitutes sufficient harm to justify setting aside the award. As well, the fact that self-interest infected the decision to ignore Anchor's evidence and deny Anchor its right to participate is self-evident in the written order of the panel wherein it specifically ruled that Anchor could not participate because it had breached its duty to compensate the panel. On the other hand, it could be argued that the final award was, on the whole, a just result and that partiality or self-interest did not affect the final award. However, this is exactly the kind of balancing which courts need to avoid. This Court is not, and should not, be in a position to review the correctness of the final award or to parse the motivations and reasoning that underlie each arbitrator's final decision.

In *Goldfinger,* 68 N.Y.2d 225, 508 N.Y.S.2d 159, 500 N.E.2d 857 [1986], lower courts had found that evidence of ex parte communications with the arbitrator was insufficient to demonstrate actual partiality. The Court of Appeals reversed, holding that the conversations "created the appearance of impropriety if not actual [**27] partiality * * * [and that] * * * Our general reluctance to disturb arbitration awards must yield in this case to the clear necessity of safeguarding the [*20] integrity of the arbitration process. " *Goldfinger,* 68 N.Y.2d at 232-233.

The Appellate Division, First Department, has consistently followed the same rule. "The appearance of impropriety or partiality is sufficient to warrant vacature of an award. Furthermore, it is only necessary to demonstrate the potential for bias to find misconduct." *Kern v 303 East 57th St. Corp.,* 204 A.D.2d 152, 153 [1st Dept 1994] (internal citations omitted); *see also Matter of Catalyst Waste-to-Energy Corp. v City of Long Beach,* 164 A.D.2d 817, 560 N.Y.S.2d 22 [1st Dept 1995]*; Matter of Fischer,* 106 A.D.2d 314, 482 N.Y.S.2d 761 [1st Dept 1984]; *see e.g. Velez Org. v J.C. Contr. Corp.,* 289 A.D.2d 105, 734 N.Y.S.2d 164 [1st Dept 2001] (finding

Case 1:07-cv-05695-JSR    Document 1-6    Filed 06/14/2007    Page 25 of 27

Page 7

2003 NY Slip Op 50013U, *; 2003 N.Y. Misc. LEXIS 13, **

that an undisclosed, but unrelated, bribery conviction of an arbitrator "placed serious doubt on his ability to act impartially and fairly * * * Such conduct tainted the integrity of the arbitration process and created an [**28] appearance of impropriety"); *Ament v Schubert Piano Co.*, 172 AD 423, 425, 158 N.Y.S. 532 [1st Dept 1916] (finding it improper for a referee to demand, midhearing, security for fees because although "it may be that the referee was not influenced by the refusal * * * others may not fairly doubt it."). [7]

> 7   Compare with *Montague Pipeline Technologies Corp. v Grace-Lansing & Grace Indus.*, 238 A.D.2d 510, 656 N.Y.S.2d 656 [2d Dept 1997] (The Second Department ruling that "There is, however, no per se rule that such communications [concerning fees] constitute misconduct impairing the integrity of the arbitration process.)*; National Bulk Carriers, Inc. v Princess Management Co., Ltd.*, 597 F.2d 819 [2d Cir 1979]; *International Produce Inc. v A/S Rosshavet*, 638 F.2d 548, 551 [2d Cir 1981] (finding a distinction between evident partiality and appearance of impropriety).

In *Excelsior 57th Corp. v Kern*, 218 A.D.2d 528, 630 N.Y.S.2d 492 [**29]  [1st Dept 1995], the Court found sufficient cause to intercede and to disqualify an arbitrator, who had expressed an opinion [*21] about the matter before the arbitration in a prior proceeding, on the grounds that "a real possibility that injustice will result * * * [if the hearings continued with the arbitrator in place]" and that "this Court was concerned with the appearance of impropriety on the part of the 'umpire' and not actual prejudice." *id.* at 530. If, in *Kern*, appearance of impropriety without actual prejudice was sufficient to remove an arbitrator, then surely, here, where the refusal to hear Anchor was an accomplished fact, not a mere possibility, directly linked to payment of the panel's fees is sufficient, without more to warrant setting aside the award.

### D. Rules of the AAA and the Code of Conduct

Violations of arbitration rules or practices, while relevant to an arbitrator's misconduct, are not sufficient of themselves to vacate an award. *See e.g. Transit Casualty Co. v Trenwick Reinsurance Co., Ltd.*, 659 F. Supp. 1346, 1353, n 7 [SD NY 1987]. However, since the agreement to arbitrate is a private contract which includes [**30] an understanding that the parties will be bound by the rules of the AAA, rather than more formal rules of law, the AAA's rules are a useful guide to the legitimate expectations of the parties.

The parties here agreed to be bound by the National Construction Dispute [*22] Resolution Procedures, as amended and effective September 1, 2000. (Rules). Rule 29 provides that both sides shall be afforded the opportunity to present evidence and examine witnesses. Although the procedure may be varied, the arbitrator is still required to "afford a full and equal opportunity to all parties to be heard." *Rule 29.* There is no allowance for "default" or "summary judgment" except that "the arbitration may proceed in the absence of any party * * * who, after due notice, fails to be present or fails to obtain a postponement." *Rule 30.*

The Rules contain a series of provisions dealing with collection of fees and compensation. The AAA may, in the event of extreme hardship defer or reduce administrative fees. *Rule 49.* Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and arbitrator. *Rule 51.* If arbitrator compensation [**31] or administrative charges have not been paid in full, the administrator may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. *Rule 54.*

As well, the Code of Ethics for Arbitrators in Commercial Disputes, Canon VI [D], states that arbitrators "should scrupulously avoid bargaining with parties over the amount of payments or engaging in any communications concerning payments which would create an appearance of coercion or impropriety." Moreover, "in cases [*23] conducted under the rules or administration of an institution that is available to assist in making arrangements for payments, the payments should be arranged by the institution to avoid the necessity for communication by the arbitrators directly with the parties concerning the subject. *id.*

In sum, the Rules do not provide for expulsion from participation in a hearing or default on the underlying contractual claim merely because one side cannot afford to pay the arbitrators before the conclusion of the hearing. According to the Rules of the AAA, the panel should not have been advised of [**32] the status of the fee dispute and were not empowered to use the arbitration proceeding itself as a way of enforcing collection of their compensation. They were permitted to suspend or terminate the entire proceeding, but they were not permitted to continue it for a paying party while terminating participation of a non-paying party.

### E. Responsibility for Fees

One problem with the panel's determination in this case is that the panel put the cart before the horse when it allowed a failure to pre-pay fees to dictate the final outcome. In a proper proceeding, the final outcome determines the liability for fees - not the other way around.

Case 1:07-cv-05695-JSR    Document 1-6    Filed 06/14/2007    Page 26 of 27

Page 8

2003 NY Slip Op 50013U, *; 2003 N.Y. Misc. LEXIS 13, **

Advances made by the parties for fees and expenses are merely interim [*24] payments which are later subject to final orders of distribution by the panel and the Court.

The Rules of the AAA provide that fees are to be apportioned equally between the parties unless they have made another arrangement. *Rule 53.* Filing fees are to be paid in advance. *Rule 52.* However, the panel may, in its final award, apportion the fees. *Rule 45 [c]; see also Rule 52, Rule 54.* There is no requirement or expectation that fees will be assessed [**33] equally. *Rule 46.* As well, in cases of financial hardship, the Rules provide for adjustments by the panel. *Rule 52.* After the panel has acted, upon a motion in Supreme Court to confirm an award, "The court, on application, may reduce or disallow any fee or expense it finds excessive or allocate it as justice requires." CPLR § 7511.

Accordingly, the final responsibility for payment of fees is not established until the panel has considered the merits of the case, adjusting fee payments in the final award, and the Court has allocated them "as justice requires" in its confirmation. Any alleged default by Anchor in this case was not for a failure to make a payment after an award or court order. It was merely for a failure to deposit, in advance, one-half of the fees subject to appropriate hardship applications or distribution orders at the conclusion of the proceedings.

An application for relief in cases of financial hardship or a request for re-allocation [*25] at the close of the proceeding are not mere hypothetical possibilities to be taken lightly. Financial hardship adjustments and allocation adjustments in the final award commonly occur in arbitration [**34] proceedings. In *Green Tree Financial Corp. v Randolph,* 531 U.S. 79, 148 L. Ed. 2d 373, 121 S. Ct. 513 [2000], consumer groups attacked the high cost of arbitration. In an amicus brief, the AAA defended its practices as follows:

"The AAA's experience indicates that arbitrators reallocate the costs of arbitration in a majority of the commercial cases that proceed to award. A claimant with a meritorious claim thus has a statistically significant likelihood of recovering at least a portion of any costs he or she is required to advance under the Commercial Arbitration Rules."

*Green Tree Financial Corp.,* US Amicus Brief of the American Arbitration Association, filed June 8, 2000, at 16 [2000 WL 744161].

Further, with regard to situations, such as the present case, involving financial hardship, the AAA, in the same brief to the Supreme Court stated,

"The AAA * * * has administrative procedures that allow deferrals or reductions in the AAA's administrative fees where extreme hardship on the part of a party makes paying or advancing some or all of such fees [*26] inappropriate. The AAA receives one or two requests each week for a waiver or deferral [**35] of administrative fees on the basis of economic hardship. When the hardship is substantiated, these requests are liberally granted." *id.*

In sum, the problem presented by Anchor's financial difficulties did not present an unusual situation. It was the panel's response which was unusual. More typically, problems in making advance payments for an arbitrator's compensation are dealt with in accordance with provisions in the AAA Rules and in statute - the proceedings can be suspended, the fees can be adjusted, the opposing party can advance payment, the panel can apportion fees in the final award, or the Court can modify the assessment "as justice requires." Neither the Rules, AAA past practices or applicable statutes contemplate a default or a one-sided presentation as a consequence of financial inability to pay fees before the conclusion of the arbitration.

**F. Waiver and Forfeiture**

Merely by failing to pay the arbitrators' fees, Anchor did not waive its right to participate. Nor did it waive it "unwaivable" right to counsel. CPLR § 7506. To the contrary, Anchor asked the panel, in writing just a few days before the panel's decision, to allow it [**36] to continue to participate with counsel. Anchor asserted that it was financially unable to comply, and the panel, in its findings, accepted that assertion to be true but held [*27] that inability was "no excuse" for failing to pay. Accordingly, by the panel's own findings, it cannot be said that Anchor intentionally or voluntarily refused to pay; nor did Anchor intentionally or voluntarily abandon its right to participate in the hearings.

After the panel ruled, over objection, that Anchor could no longer participate and that counsel could do no more than "attend and audit," counsel withdrew and Anchor did not "attend." However, this cannot be turned into a post hoc determination that Anchor waived its rights after the panel had already stripped them away. Anchor, by objecting before the panel ruled and continuing its objection at the first available opportunity, the current Court proceeding, has never waived its right to participate.

Similarly, the "default" ordered by the panel cannot be supported by a claim that Anchor somehow forfeited its right to participate. A forfeiture can be imposed in civil or criminal cases to prevent a miscarriage of justice whereby one party would benefit [**37] by its own wrongdoing. *People v. Sanchez,* 65 N.Y.2d 436, 492 N.Y.S.2d 577, 482 N.E.2d 56 [1986]. Thus, for example,

Case 1:07-cv-05695-JSR    Document 1-6    Filed 06/14/2007    Page 27 of 27

Page 9

2003 NY Slip Op 50013U, *; 2003 N.Y. Misc. LEXIS 13, **

if one party destroys evidence, wrongfully resists disclosure, intentionally absents itself, or prevents a witness from testifying, it cannot profit from its own misconduct. As the Court in *Sanchez* explained in describing forfeiture, "The question is one of broad public policy....Neither in criminal nor in civil cases will the law allow a person to take advantage of his own wrong." *Sanchez, id.* at 444, quoting *Falk v United States* (15 App DC 446, 460, *cert denied* 181 U.S. 618, 45 L. Ed. 1030, 21 S. Ct. 922, as quoted in *Diaz v United States*, 223 U.S. 442, 457-458, 56 L. Ed. 500, 32 S. Ct. 250 [*28] [1912].

Although Coty claims, in its papers that Anchor wrongfully refused to pay the fees as part of a strategy to stop the hearings [8], no record was ever established to support the claim and the panel avoided any inquiry or finding in that regard. The panel, in its decision, viewed the entire issue as one of "breach of contract", i.e. a failure to pay the arbitrators' fees without [**38] regard to any underlying motivation. The problem with a "breach of contract" theory is that it does not support the remedy employed. If Anchor breached a contractual duty to pay money to the AAA or the arbitrators, the remedy lies within that contract - not by punishing Anchor with an unfairly-decided award to Coty for construction overruns. An arbitrator takes an oath "to hear and decide the controversy faithfully and fairly" CPLR § 7506 [a]. That obligation, owed to both parties and the public, cannot be withdrawn by the arbitrators because one side or the other fails to make timely compensation payments to them.

8    *See Pet. Supp. Aff. in Support of its Motion to Confirm*, Ex. 19, Letter to Case Manager, dated January 10, 2002..

## Conclusion

Anchor Construction was denied a fundamentally fair hearing. It was wrongfully [*29] denied the right to be heard, to examine witnesses, to present evidence and to be assisted by counsel. The denial was grounded upon misconduct, since it [**39] was the arbitrators' immediate reaction to the discovery that Anchor had not deposited money in their account with AAA - a matter in which they had a direct financial interest.

Accordingly, the award is vacated and the proceeding is remanded for a new arbitration to be conducted before a different panel. CPLR § 7511 [d].

**James A. Yates, J.S.C.**

Decision Date: January 8, 2003